Good morning, Your Honor. Roger Hanson, H.A.N.S.O.N. of Santa Ana for the Appellant Casillas. To get to the main thrust of my argument here, I'm going to ask this Court to preside at the funeral of Calject 2.90 as written today, because I think it's obvious that it does not satisfy interiwinship, and I'm contending that it is a structural failure, a structural defect within the meaning of Toomey v. Ohio, Gidding v. Wainwright in the cases that hold that there cannot be coerced confessions and things of this nature. And the authority for a structural failure, I think, is Sullivan v. Louisiana, which I cite in my brief at page 8, and I simply would like to say a quote from it. It says, This beyond a reasonable doubt requirement, which was adhered to by virtually all common law jurisdictions, applies to state as well as federal proceedings. It makes it clear also that this defect is not amenable to the federal harmless rule of Chapman versus California, but is a so-called structural error, one that requires automatic reversal. That's out of Sullivan v. Louisiana. And at page nine on my brief, I say the deprivation of that right with consequences that are necessarily unquantifiable and indeterminate and questionably qualifies as structural error. Well, let me just see if I understand what your contention is. The jury is told that as to the crime charge, it has to be proved beyond a reasonable doubt. Only that, not its elements. Yeah. Only that. The crime charge has to be proved beyond a reasonable doubt. Right. They are then told there is some evidence that shows the defendant did similar things, and those similar things can be proved, like other peripheral facts, by a preponderance of the evidence. That's true. So where is the error? Well, the problem is, Your Honor, that if that is integrated into the overall jury determination as to the charge crimes, then we don't know what was utilized by the level of preponderance. Well, that's different from the proof of any other circumstantial fact. You don't have to prove every single fact in the criminal case beyond a reasonable doubt. Well, you take… The crime is beyond a reasonable doubt. Well, if you take a look at Winship, it talks about facts. And the other thing, Your Honor, in this case is Calgic 2.01, which ostensibly could have saved this problem, was not read to the jury. And that's a sui spondi instruction. Well, I don't think you're exactly answering my question. Isn't it generally true you don't have to prove circumstantial evidence beyond a reasonable doubt? Well, under Calgic 2.01, you do. Now… Well, I'm talking about federal constitutional law. To send somebody to prison, all you have to do is prove the crime charge beyond a reasonable doubt. Isn't that right? Well, that's true, but you have to tell them that each element of that crime must be proven beyond a reasonable doubt separately. Why is it an element of the crime to show this person did somewhat similar things? Well, because it went to the specific intent. The specific intent, if properly instructed, would have to show beyond a reasonable doubt that he did this act to turn himself on sexually or the child victim on sexually. Beyond a reasonable doubt. Now, that was not given. That element was not given separately beyond a reasonable doubt. And they were never even told this, that that had to be done beyond a reasonable doubt. Then I might concede some of this stuff, that if they were told that that element and every element had to be proven beyond a reasonable doubt as required by Winship, then we might not be here. But it was not done. And the worst thing about it was, of course, the interesting thing was that Calgic 2.01 was not given. And then to go on a little bit further, the California Court of Appeals ruled that Calgic 2.5 0.1 was incorrect and should never be given again. And amazingly, didn't publish that opinion, which would send out to the world, the superior courts around California, that that shouldn't happen. And they excuse it by saying two and other amazing things. Number one, there was a jury questionnaire that talked about reasonable doubt, but again, did not specify that each element must be proven beyond a reasonable doubt. And secondly, the argument of counsel. Now, we all know that number one argument of counsel cannot supplant for proper jury instructions. We know that. And certainly a jury questionnaire cannot supplant for these instructions. And so that's how the California Court of Appeals excused this. They never published this opinion, which makes me paranoid because I think of an opinion like that that rules out a key jury instruction ought to be published. And I'm sure it was not because they didn't want to admit what I just told you, that they're going to say on the record that a jury questionnaire or argument could supplant for the jury instructions. And is there any procedure like we have in our court for asking the California Court of Appeals to reconsider the decision not to publish? I don't know. I don't know. You've never asked them to publish something that they had issued as a do not publish decision. Oh, if it was favorable to me, I probably would have. Yes. I mean, we do have that procedure, as you probably. Yes, I'm aware of that. For our memorandum dispositions. Now, moving on, I think the key thing on the U.S. magistrate judge's position was he kind of admitted that this stuff happened. But he says the case is saved by Nieder, N-E-D-E-R-V-U-S, which is 527 U.S. 1, which I say does not really apply here because Nieder was a situation where the federal judge took away the issue of materiality from the jury in a demanded jury trial and found it true beyond a reasonable doubt. So integrally, in Nieder, the judge plus the jury found every element true beyond a reasonable doubt. And the issue in Nieder was whether that takes away the right to trial by jury. And so Nieder, I don't think, applies here because this was not a situation where all elements were beyond a reasonable doubt. Counsel, if we disagree with you regarding whether or not this is structural error, if we apply the harmless error standard, was the error in this case harmless? I certainly not. I don't see how it could be. Why not? Well, because it just removed any possibility of this defendant from getting the benefit of what I think is required by Winship. You can't tell today what this jury come up with as to beyond reasonable doubt slash preponderance, whatever. You can't tell that on this record. And that's what's wrong with it. Interestingly enough. Setting aside the erroneous jury instruction, you don't think there was sufficient evidence in the record to support a conviction? Well, there was evidence. Surely, I admit there was some evidence, but we don't know whether the. Is this tainted by the fact that the jury instruction might have led the jury to use the wrong standard? Yes, yes. I admit to the court there was some evidence. The kid, you know, you know, interestingly enough, two of the three counts the jury hung up on. So they really weren't that convinced of everything she said. So there was some evidence. But the problem is the standard here. And just in closing here, I don't want to belabor too many points. I think my briefs make it. But the major U.S. Supreme Court case of Victor versus Nebraska and Sandoval versus California, which I rely on in my brief for, interestingly enough, the opening statement in the Victor decision says, quote, the government must prove beyond a reasonable doubt every element of a charged offense in Ray Winship. Then they go on, say, in this case, as we consider the Constitution, only two attempts to find a reasonable doubt. So the interesting thing about Victor and Sandoval, it did not deal with what we're talking about today, whether those cases satisfied the Winship decision. It took off on whether the Nebraska instruction and the California instruction satisfied or what or whether it was easily defined. I guess the definition of reasonable doubt. And so those cases, while I rely on them, I rely solely for the fact that the introductory statement, again, cites Winship. And I think this is a very, very serious thing. I read with careful interest about three weeks ago an article in L.A. Times. The chief justice, Ronald George of California, was going to have the Calgic instructions revised. He thought they were too esoteric, too enigmatic, too mysterious to the average layman. And I think this gives an opportunity for the chief justice to take care of Calgic 2.9. I know which could be done very simply, could be done very simply. And if you take a look at the federal jury instruction, it completely complies with Winship. Completely complies with Winship. Counsel, is the petitioner still in prison? No, he's out now. He's out. He's on probation or parole? Yes, he is, Your Honor. Mr. Hanson, if you could help me as well. One of the puzzles that I have is the standard that we are to apply in reviewing, to follow up on Judge Rawlinson's question. Assuming that we don't agree with your assessment that this was structural error, are we to engage in our own Brecht analysis in order to determine whether it was harmless beyond a reasonable doubt? Or under AEDPA, do we look at the determination by the California Court of Appeal and ask whether or not it was an unreasonable application of Supreme Court precedent? I think the latter. I don't think the California Court of Appeals really addressed harmless error significantly, which is an interesting thing because there's an Eighth Circuit case, which unfortunately I don't have in front of me, that says basically that Brecht does not apply in the U.S. Circuit Courts if the lower court, the lower state court never addressed it to start with. Somewhere along the line, the Chapman versus California harmless error rule ought to be applied. I have a Tenth Circuit case, too, that also addresses it, Saez versus Burnett. I have an Eighth Circuit case. I think it says the same thing that the Eighth Circuit does. And as far as I can tell, we have no controlling Ninth Circuit authority to answer my question. Well, let me create some today. That's why I was asking for your take on it. I appreciate your input. Yes, I believe, Your Honor, that if this case does not – you know, the simple fact is if the court would direct them to properly restructure CALJIC 290, we wouldn't have these problems, and I think that's the main issue of this case. Of course, we have to be a little careful here in the light of the Supreme Court admonition that as federal judges we don't exercise supervisory control over state trial courts, unless we might like to. I understand, Your Honor, but nonetheless, this is clearly a windship issue, and the U.S. Supreme Court has spoken on this, and I think the court can declare that CALJIC 290 as framed does not comply with windship, and even fashion – I could fashion it myself. As a matter of fact, I did it in Orange County, and the judge went along with it, and I got an acquittal in that case, but I don't have too much luck with the appellate courts on it. I think this is high time that this be taken care of. If there's any other question, I can answer. Thank you, Mr. Hanson. I just appreciated your argument. May it please the Court, Donald DeNicola for the respondent. Just in a quick answer to Judge Tallman's question, I believe in Baines v. Canberra, the Ninth Circuit held that the Brecht standard would apply in a habeas case regardless of a harmless error analysis that the state court undertook. And I think that Karras v. Calderone. So you have answered the question, and the answer is we apply Brecht. I think the Court applies Brecht irrespective of whether the state court did a Chapman analysis. I think the fact that the state court did a Chapman analysis, nevertheless, would merit deferential review under the 80 DPA as a first step. And I think the 80 DPA really is the structure for both of the main questions in this case. The first is I think whether the state court of appeal engaged in an unreasonable application of Supreme Court law when it determined on the basis of the facts in this case that there was no reasonable likelihood that the jury misunderstood the instructions in an unconstitutional way. The question is whether or not this case falls into the subset of cases where the federal court could say that the state court was not only wrong but objectively unreasonable in making that determination. And I don't think that the federal court could plausibly do that in this case because there's a firm basis in the record for the state court of appeals determination that there was no reasonable likelihood. First is that the instructions explicitly did tell the jury that the prosecution had the burden of proving guilt beyond a reasonable doubt. And the instructions further told the jury that in order to prove the crime charged, each of the following elements must be proved, and then delineated the three basic elements, the touching, the age of the victim, and the lewd specific intent. So those instructions comply fully with Victor and with Sandoval. Second, I think, the argument that the instructions on the prior crimes somehow undermine this is untenable. The prior crimes instructions set out a preponderance of evidence standard for the proof of the prior crimes explicitly, but those instructions never said anything that contradicted the jury's obligation as set out in the reasonable doubt instructions to make the further determination of guilt beyond a reasonable doubt. Third, I think, the fact that the jury acquitted on two of the three charges belies any claim that the jury somehow looked at the priors, found them beyond, found them proved by preponderance, and then automatically found the defendant guilty. The evidence of the priors was the same as to all three counts. If the jury believed that preponderance finding on the priors sufficed to find the defendant guilty, they would have found him guilty necessarily on all three counts. I think, fourth, as the Court of Appeal, the State pointed out, the arguments of counsel, both the prosecutor and the defendant, reflected the distinction between the two. That's an argument I wish you wouldn't make. I mean, it very is. You can't rely on counsel. I would just drop that. It makes the whole argument sound weak when the counsel instructs the jury. Well, I think in terms especially of the ADPA standard, I think it's an element that I think provides assurance that the State determination was not objectively unreasonable. The same, I think, goes to the noting that the judge had given a pre-instruction on reasonable doubt. That probably, I think, was unlikely to have been ignored by the jury. But I do think, I think Judge Noonan, you're right, that the literal reasonable doubt instructions, the absence of any contradiction in the challenge instructions, and the jury's acquittal I think provide a firm basis that precludes any determination that the State court opinion was objectively unreasonable in its application of victory. Even if it were determined that that conclusion was objectively unreasonable, I think the Court would have to make further determination that the State court's harmless error analysis was also objectively unreasonable. And I think as the magistrate found correctly, there was very strong evidence, particularly with respect to the direct evidence of the victim in the count for which the defendant was convicted. Direct evidence that under the circumstances, the lewd intent was manifest. Taking that plus the evidence of the priors, I think this case falls into the class where the Supreme Court, under Nieder, would find that any error was harmless beyond a reasonable doubt, and that certainly any determination by the State court on these facts that it was cannot be condemned as objectively unreasonable. And on the Nieder question as well, any residual uncertainty about whether Nieder and harmless error analysis would apply in this case, I think goes by the wayside because what the Petitioner needs is a clearly established Supreme Court case that says harmless error analysis does not apply to this type of error, that structural error obtains here. And in the absence of a clearly established Supreme Court case, merely trying to distinguish Nieder isn't going to suffice to overcome the ADPA standard. If there are no further questions, I have no further comments. Thank you. Mr. Hanson. I still say, Your Honor, that no matter how, quote, strong, unquote, the evidence, we cannot tell today what this jury decided without the proper instructions. How about opposing counsel's argument that the jury had to segment out the standard of proof because the fact that they only convicted on one count shows that they realized what was at issue in this case. What's your counterargument to that? Well, because I don't know what level they decided it. They may have thought, well, you know, it's more likely than not. If they don't have that element instructed on the proper standard beyond a reasonable doubt, we cannot tell today, and all due respect to this Court, we cannot tell today at what level they decided this. That's the problem with it. Mr. Hanson, the only problem I have with your argument is, and I respect your position because I find it very difficult to make the analysis that Brecht asks us to do because it really does ask us to sort of put ourselves in the jury room and view the record as a whole and try and determine whether or not there's a reasonable likelihood that this led to the error. But there are a host of cases in which there were defects in the instruction, and yet the Supreme Court tells us that we must apply a harmless error analysis where we don't find the instruction to be structural. So I guess my response to your position is the Supreme Court doesn't seem to agree with you. Well, I think it all depends on what we're talking about here. Here we are talking about a win-ship error. For example, neither. Neither could be. I agree with you. If we decide it's structural, that's the end of the inquiry, as I understand. The Supreme Court authority, because it says that we presume that the error in the instructions was prejudicial. And I read Sullivan, you know, look at page eight and nine of my opening brief. Sullivan clearly makes it plain that it's structural error. This is structural error. And in the cases that the court talks about, I agree, there's a huge number of cases. And I've probably not read all of them. There's probably cases that distinguish one thing or another. But we're talking here about the win-ship element instruction. And I think Calgic 2.90 certainly fails to do that. And had 2.01 of Calgic been given, then I probably would not have much to say about this. But that was not given. That's a sua sponte instruction. This man had no chance in this case the way it was done. And the way they get out of it, as I say, not by applying some harmless error analysis, but by saying that this argument of the jury and the jury instruction questionnaire alleviates them. It just is not correct. It's not sound law. And I ask the Court to put an end to 2.90. The Court can do it, and they can revise it. And from now on, it would be correct, just like the Federal instructions. It's a serious case, Your Honor. We appreciate that. Thank you, Mr. Hanson. And thank both counsel. The case was well argued, and it is submitted. Would the panel like a recess before the last case, or do you want to keep going? All right. We'll hear the last case on the calendar, Medina v. Cournot. Charles Savilla on behalf of the petitioner appellant, Alan Medina, may it please the Court. I'll probably end up reserving a couple of minutes for rebuttal. This, too, is an AEDPA case. This, too, raises a 2.90 issue. A little further back in the brief, probably the Mr. Hanson's brief. But I want to address, in dealing with AEDPA, the issue under 2255d-2, and that is this court's deference to a state opinion when there are significant factual mistakes in the opinion. And what I'm addressing, and these are, of course, noted in the briefs, but since some of the issues deal with the facts, as all issues must, if they're erroneously interpreted by the state court, this court is in a position to assess the facts as they really are reflected in the transcript. For example, one of the issues that the state court of appeals said was that this was merely an issue of whether the defendant drove into the pedicab or whether the pedicab driver drove straight into him. Well, that wasn't what the defendant's testimony was. The defendant's attorney in opening statement said, and this is in the excerpts, that Mr. Medina will testify that the pedicab driver at the last second drove in front of him, turned his bicycle so that the bicycle end went in front of him. Mr. Medina said that in direct examination. That's what happened. And he said it in cross-examination twice. This was important because this was his accident description of what happened. And that is important because it reflects on the misstatement of the facts by the court of appeal in finding errors harmless. And specifically with respect to the exclusion of the accident reconstructionist and his testimony, his testimony verified exactly what the defendant said. That is that the pedicab driver had to have been driving at the defendant and then at the last second hooked left with his bike so that the pedicab did not follow in line, but the cab went to the left and the front part of Mr. Medina's car hit the right rear wheel, thus demonstrating that the accident happened as Mr. Medina said, but that was excluded. Are you now asking us on federal habeas review under AEDPA to declare an evidentiary ruling by the state trial court that the defendant's accident reconstructionist was not competent to testify to the evidence that you just proffered and that we should grant habeas relief on that basis? Absolutely. And what authority do you have that gives us the right to do that under 2255? Well, the most recent example is the Alcala case where in a death penalty case, the trial court had excluded a mental health expert who was going to testify that the complaining witness's testimony against the defendant, Alcala, was probably given her versions of the offense were probably given under the effects of hypnosis, and that was excluded by the court and that was one of the bases this court held at reversible error as a denial under Washington v. Texas of the right to present a defense. Counsel, wasn't that a pre-AEDPA case? And I thought Judge Tallman's question went to the AEDPA standard. Well, it is a pre-AEDPA case, but we're talking about the right to present a defense. Well, I thought his question was under the standard of review of AEDPA, how do we reach an evidentiary ruling? And so a pre-AEDPA case really doesn't help me with that analysis. Well, every time a court excludes at trial an expert or other witness from testifying, it's an evidentiary ruling, and that's the way the state court characterized this. But the defendant has a right to present a defense, and it can't be denied simply under the rubric of saying this is an evidentiary. The Supreme Court says it's not an unlimited right. He can't call witnesses who have nothing relevant to say about his defense. The Supreme Court basically says that's the job of the trial judge to make those kinds of determinations. Well, was that decision reasonably made in this case? Again, the facts. I don't think that's the law, is it, Counsel? No, this is the question on an exclusion of an expert on grounds that he's not competent to offer an opinion. And as I understand it, the reason was he'd never gone to the accident scene. He was relying on photographs that were taken after the vehicles had been moved, basically what looked to me to be pretty legitimate reasons for saying to the expert, you're not qualified to render an opinion. I mean, we don't review that on whether or not it was reasonable or not for the court to exclude it, do we? Yes, and let me address the record on what he relied on. First of all, the district attorney told the court that the reason that the expert couldn't rely on the pedicab itself was, quote, that it was returned to Mr. Inyon, the owner, here's the quote, before he, that is the defense, or I had an opportunity to have that not happen. That's at ER 42. In other words. So he couldn't look at the pedicab. Right, because they gave it back to him and he was back riding his route the next whenever. Mr. Eurbanks, the expert, relied on, as he said, and this is in ER 115 in his report, 35 color photographs of the vehicles in the scene, a 15 page vehicle impound report, the crime report, the arrest report, the death detectives follow up report, whatever else the defense counsel told him about the case. But it's not like he just came in out of the blue and didn't know what was going on. But didn't the trial judge also say, you know, even though this guy has a lot of experience with regard to vehicle-vehicle accidents and vehicle-pedestrian accidents, he's not investigated vehicle-pedicab accidents? Well, of course, the expert said this is a car on a bike. The pedicab didn't get involved. It was not in line. He hit the right rear tire of the bike. So I would say that the criticism that he hadn't done investigations of pedicab accidents per se would have gone to the weight, but to exclude the testimony because. . . If we were reviewing a federal trial judge's ruling, it would still be an abuse of discretion standard, not. . . And you're on AEDPA review here, I mean, which is even higher than an abuse of discretion. I don't see how we get to this point. Well, with respect to the record, also reflects that this expert was testifying that he had experience in weighing pedicabs. So in terms of his experience with pedicabs, he got cut off at ER. . . This was at ER 27. When he started talking about his experience with pedicabs, he says, well, when we used to weigh them. . . And then he gets cut off and the prosecutor says, well, what about this pedicab? Well, the government had given the pedicab back. So, again, if one reads the vita of this expert, he was incredibly qualified in terms of talking about speed and angle. And the articles in his vita talking about this issue are innumerable. And to exclude him as stating they had no pertinent experience was irrational. And I think that it was the only defendant. . . It was the only proffered witness the defense was going to put on to corroborate his testimony, thus making it even more important. One of the. . . And just so the record is correct on this, another error of the State Court of Appeal in denying this testimony was that they said that he really didn't know the angle of the impact. And that is flat out wrong. The briefs state why the transcripts were misinterpreted on this issue. But his report states the angle in his testimony. He's talking about the angle and that the crush angle was right. Excuse me, left front fender and the right rear of the tire corroborating the defense. Let me move on to the instructional issues. This was when the judge went into the jury room to talk to the jurors. The state concedes in the state court of appeal held that he erroneously added his own addendum to the agreed upon instructions, which were going to be that he simply tell them to reread for instructions. Instead, he went in and told them that this is not rocket science. First, he said, I want to say that the attorneys have told have allowed me to come in and say this to you. So he gave the jurors the imprimatur that this was the defense counsel agreeing with him, going in and telling them that this is not rocket science. And common sense in your own common interpretation of the words will guide you through these instructions, which I would say is. Well, it may seem counterintuitive to argue to you that telling a jury to use the common meaning of words is improper. Instructions are not always based on the common meaning of words. For example, in a murder case, if I if a jury came back and said, what does malice mean? And the judge came back and said that to them. Well, malice in a dictionary definition means to vex and annoy. If somebody got convicted of murder based on vexing and annoying someone, I think there would be a lot more people in trouble these days with serious offenses like that. So it's it was an inappropriate comment. And the court held it harmless because they didn't see that telling the jurors that they could use their own common sense meanings of terms was harmful. And I've argued in with respect to several arguments on the instructions, which already had their own problems. But when you add to it this imprimatur of the judge telling them it's also simple, just use the common meaning of terms. Well, they typically ask questions on what does intent mean in this case? The issue you give them instruction numbers when he went back. Yes, he did answer. And then they were asking questions on things like, what do you mean by proof? And what is intent? And then he said, look at these instructions and use your common sense. And the common meaning of words. Right. Yes. And so your argument, I guess, has to be that based on what he said, and I guess it was a court reporter there who took it all down. Yes. That they completely ignored the instructions and just, quote, use their common sense to decide what those words. Not at all. They came back with questions about the intent instructions and the beyond a reasonable doubt instruction. And they asked for some illumination from the court on that. So the court came back and said, this is not rocket science. Just use the common sense, common meaning of terms. Are you urging us to find that they essentially ignored the language of the instructions? I'm saying that when they had questions about these instructions and they heard the judge say, use your own meaning. Your own common sense meaning of these terms that gave them a license to use whatever they felt the terms that they had trouble with meant. Answer to my question is, yes, your position. Yes. It was a while. The instructions and basically just decided whatever they thought they meant. Well, they gave. Well, one of the arguments with respect to the assault intent is that the felony that was given them didn't have an intent component. And the prosecution saying, well, they went they had to go to the LIO to get the definition. So there's a good reason why the jury came back and said, we've got a problem with intent in this case because it's not in the felony instruction. He did not direct them to the misdemeanor instruction. He on intent. He gave them three three. Oh, which which is really a reiteration of the felony intentless instruction. So then they went back. Having been instructed, you do not have to even look at the misdemeanor, because if you're going to find guilt in the felony, you need not address it. So there's no there was no warrant for them to rely on the the instruction on the assault definition of the misdemeanor. And they could have used their common sense, common meaning, whatever that would have been on the assault instruction to convict of the assault with a deadly weapon. The same would hold with respect to beyond a reasonable doubt and Calvin to nine. Oh, which tells the jury that they can convict if they are on satisfactory evidence, if they have a feeling of an abiding conviction in the truth of the charge. Now, that doesn't sound like what the Supreme Court was talking about in Sandoval when it said the jurors must have a subjective certitude. Based on the evidence of the truth of the charge or in Cage versus Louisiana, where they said. Proof beyond a reasonable doubt means evidentiary certainty. The Supreme Court of California, when it read what the US Supreme Court said in Sandoval, where the Supreme Court, US Supreme Court had questions about the use of the term moral certainty, which is a probability standard. The current tune I know goes, you must have a feeling of abiding conviction and used to say to a moral certainty. It had a probability standard. They took that. Unfortunately, the court removed those words. So now we just have an abiding conviction, which means a lasting belief. And the juror, of course, the juror given the wildcard instruction by the judge to define those terms, which it asked for some help on, it was told, just use your own common sense in your own definition of the terms. Well, an abiding conviction is not proof beyond a reasonable doubt. You can have a lasting belief on a hunch, on a suspicion, on a probability or clear and convincing evidence. But it isn't requiring them to find the facts to an evidentiary certainty, as Cage says, or to a subjective state of mere certitude. What do you do with cases like Victor versus Nebraska, which seem to give a stamp of approval for using the phrase abiding conviction? There's nothing wrong with the word abiding conviction. And on pages 14 and 15 of Victor, it says there's nothing wrong with the phrase abiding conviction without the term moral certainty. And it cites Hopp versus Utah. And Hopp versus Utah is one is the approved reasonable doubt instruction that says an abiding conviction. And it has a probability standard followed by the most important to a probability that would match making a decision in the most important affairs in your own life. So is your argument that it was appropriate to use the phrase abiding conviction, but there should have been a definition included? No, not a definition. What is your argument then? If you agree that use of the phrase abiding conviction is appropriate, then what is your argument? The argument is it needs a probability standard. What you have is an abiding conviction that says abiding conviction simply means lasting belief to what probability? What's your best case authority for the proposition that a probability has to be included with the phrase abiding conviction? Hopp versus Utah, which says which Victor cites, and Hopp says approves the reasonable doubt instruction that has an abiding conviction to a probability standard. Does it say that's required? It said that that was an approved instruction, but did it say it's required? Well, in Sandoval, they cited abiding conviction and cited Hopp as well. That still doesn't get to your position to say that a proportionate measure must be included. That's what I'm looking for. Right, right. Well, then I go back to Cage, a 1990 case where Victor versus Nebraska, Sandoval versus California, a 1995 case, which both say that this term means a probability standard amounting to evidential certainty in Cage or subjective state of near certitude. Right now, there is no probability standard. By Justice O'Connor's language in Victor versus Nebraska at 1243, there are no magic words to explain reasonable doubt. We're not dictating here that you have to use expressed words. And it seems to me that's the position that you're now taking. I have no quarrel with that because the Supreme Court has intimated that there need be no definition of beyond a reasonable doubt. But once you start defining it and you define it in terms less than the due process requirement of winship, so that there can be a conviction on less than evidentiary certainty, then you're in trouble. So, yes, the court has approved a multitude of instructions. I've done a survey of all 50 states and there are numerous formulations of reasonable doubt. There are even cases that have approved the moral certainty standard after Victor. They said, well, the Supreme Court found nothing wrong with abiding conviction to a moral certainty because they affirmed in that case. They just had problems with the formulation. Thought it was confusing, but it wasn't unconstitutional. And in keeping moral certainty, we had a probability standard. There is no probability standard. This jury wanted direction on it and instead got the answer. So, yes, the court has approved a multitude of instructions. I have no quarrel with that because the Supreme Court has intimated that there need be no definition of beyond a reasonable doubt.  then you're in trouble. So, yes, the court has approved a multitude of instructions. So, yes, the court has approved a multitude of instructions. So, yes, the court has approved a multitude of instructions. I have a question for Justice Steve Auding on behalf of Respondent. In this case, as the Court is well aware, the California Court of Appeal issued a reasoned decision rejecting each of the claims made today by appellant. Before addressing the merits of those claims, I would therefore like to address the standard of review under AEDPA for claims such as the present and specifically claims such as the present in which the state court found error but nevertheless applied a Chapman harmless error standard, as the previous case also raised somewhat of the same issue. In a subsequent letter brief, I have informed the Court of five different decisions which have applied subsequent to the briefing in this case, and I would like to turn to those because I believe those apply and help clarify the standard to be addressed in such an instance, both in general regarding the standard to be applied under AEDPA, but also more particularly the standard to be applied in cases such as this with a Chapman analysis. Now, the first of these cases is Lockyer v. Andrade, in which the United States Supreme Court, as a general matter, overruled the Ninth Circuit's Van Tran analysis requiring a clear error standard. And the Court did that based upon the rationale that the clear error standard equated error, albeit perhaps clear error, with the objectively unreasonable standard which is required by AEDPA. Subsequently and more recently, in Clark v. Murphy, this Court recognized that it had not previously applied the requisite deference that was required under AEDPA, and specifically 2254d. I would point out this is a 2254 case and not a 2255 case, as counsel has previously mentioned. Taken together, these two cases in themselves would apply more generally the standard of deference to be controlling. Also control the level of deference to be applied more specifically when we have a court determination regarding Chapman. It is not enough for a Federal court to determine de novo under Brecht whether error was substantially injurious. Instead, I would submit before a case, a State case can be reversed under 2254d, a Federal court of review must determine that that State court determination was unreasonable and objectively unreasonable. And that standard of deference to an objectively unreasonable determination is different and is a completely different type of analysis than that which exists under Brecht. It's not de novo. The Court must look to what was done in the preceding proceedings. So, counsel, walk us through, for example, how we would review the objection by counsel today regarding the expert prohibition on the expert testimony. So how would our analysis go in terms of AEDPA standard from your point of view? Your Honor, regarding the expert determination, that was not a case where they applied Chapman. Instead, they found, first of all, that there was no error. And then the Court also found that the proffer went only as to speed and not as to the angle of impact, and then went on to apply a Strickland standard as to the angle of impact. This Court, in order to determine what is the appropriate remedy, could skip all the way over to Brecht and just decide it right there. That is the tact that the United States Supreme Court took in Henry v. Johnson. Skip all the way to Brecht. Right there. There's the answer. Not substantially injurious. I would submit that if the Court were to conclude under such an analysis that there was a substantially injurious error, it could not reverse unless it also completed the AEDPA analysis under 2254d. In the subsequent case, which was decided by the Seventh Circuit, which was also cited in this letter brief, Aleman v. Stearns, the Seventh Circuit demonstrated how this application would work. The unreasonable determination application comes within subsection D, 2254d. Brecht falls within the confines of 2254a. So while the Seventh Circuit acknowledged that there is leeway and acknowledged, for instance, under Penry, that it would be possible to skip to Brecht and conclude there was no substantial injury, in order to reverse, both analyses would have to be completed. And it would have to be done so, so that it could be said that there is a ‑‑ that the State court determination was unreasonable. Now ‑‑ Objectively unreasonable. Objectively unreasonable. Thank you, Your Honor. Now, Judge Rawlinson, to answer your question more specifically as it relates to the second issue regarding the expert witness, I would submit the proper interpretation. There are actually several roads to reach the result in this case. Some of the courts have reached them in a variety of means. Some have applied the Dukat analysis. Was there a violation of due process, which requires the analysis of five separate factors, including essentially did it amount to such an overall pervasive error that it would have amounted to a due process violation? I would submit that the correct analysis would be, as the district court of appeal and the State court reached, is to determine, first of all, what was the proffer to? The proffer, as the record unambiguously reveals at pages 12 and 13 of the excerpts of record, reveals that it was proffered only as to the speed of the collision, the speed of the automobile at the time of collision. So there was no proffer as to the angle of impact. The angle of impact was only relevant insofar as it affected the calculation regarding the speed. This was the determination of the State court of appeal. Hence, we determine angle of impact, whether there was a U-turn being made, was not proffered. Was counsel ineffective in failing to proffer this, in failing to offer this evidence? No. This is where counsel started off today, saying that the State court of appeal made major factual errors. We don't even have to reach that. And we don't have to even reach that conclusion for the simple reason that he was not qualified, as the – both the magistrate and the – or the district court judge ruled in the instant case. The expert witness was not qualified to render an opinion regarding pedicab collisions. Hence, counsel could not have been incompetent. His standard could not have fallen below objective professional norms in the instant case because the – it was inadmissible for the same reason it was inadmissible regarding the speed. He did not know – he hadn't examined the present pedicab. He didn't know the weight or the size. He hadn't seen anything other than the pictures of the pedicab. He was unqualified to do any type of analysis regarding pedicabs. And what's particularly significant, and what I would submit counsel overlooks, is that his determinations regarding the angle of impact were contingent upon a notion of a pivoting of the pedicab. Hence, his determinations essentially relied upon how the pedicab would – the dynamics of the pedicab in a collision, which, of course, requires knowledge of how a pedicab would respond. And yet, he did not conduct experiments with pedicabs. He was not competent under State law, as the trial court determined. And therefore, there could be no ineffective assistance of counsel, no incompetence for failing to proffer the evidence, and certainly no prejudice. Returning to the Brecht analysis, however, how a case such as this would typically arise and how it should be decided applying both the AEDPA and the Brecht analysis. We have a – there is a conflict in the circuits as to how this should be done. We have an early decision by the Sixth Circuit in Nevers deciding that it should be done – that the two standards essentially collapse, and therefore, it cannot – if something were substantially injurious under Brecht, then if so facto it would be the case that it would also be harmful under Chapman, even with deference. I would submit that this is not the correct approach. There is a more recent – the Tenth Circuit has not sided with this and has in fact said that both analyses must be applied. And I would submit that this is the proper approach to be applied in cases such as the present. So you're asking us to depart from our prior precedent? Is that what you're asking us to do? No, Your Honor, I am not. I don't believe that this Court has addressed that issue previously.  And I would refer this Court to the recent Tenth Circuit decision in Cargill v. Mullins, which – I thought you said the Tenth Circuit didn't agree with us on that. If I did, Your Honor, I must have misspoken. The Tenth Circuit did not agree with the Sixth Circuit. This Court has not – has not spoken as to this issue. I would invite this Court to reach this issue today. It's an issue that comes up very frequently and one which must be addressed. The Tenth Circuit, and in Cargill v. Mullins, is – I believe is particularly illustrative of this principle. There, they applied Chapman with deference at one point when there was a Chapman determination, and yet at another point in the decision, they applied Brecht because there was no Chapman determination.  I would submit that this is – that this is the proper way to approach these cases, and it is, as the present case perhaps uniquely illustrates, we have in the present case a lengthy Chapman analysis by the State court. It cannot be said that that analysis is unreasonable. We have the State court making findings of fact, mixed findings of – and mixed findings and conclusions of law. We have the State court conducting an Internet search regarding the common understanding of the term rocket science, determining that based upon that common understanding, the jury would not have taken offense at this, would not have determined that the court was attempting to cut off all further – further discourse. Now, as individual judges, you may well conclude, well, that's not the type of analysis that I would conduct. But that's not the question. The question is, can it be said under – under Chapman and deference, the deference which the United States Supreme Court has – has ordained, and as this court has stated in Clark v. Murphy, we are required to follow. Can it be said that this analysis, this five-page analysis where they went thoroughly through each of the reasons, that this is objectively unreasonable? Even if this Court would conclude, let's ignore all that. Under Brett, I personally, conducting a de novo review as – as a judge, maybe I would conclude that this was substantially injurious. But that's not the standard. The standard is, was this court of appeal objectively unreasonable? And that is why I would – I would submit that that is the proper analysis. And I would also submit it is not – it cannot be said that they were objectively unreasonable. They cited – they cited reasons for their decisions, and those reasons have not been shown to be unreasonable. Among others, there was nothing belittling about any of the terms. I would point out to the Court that the Ninth Circuit's pattern jury instruction, 3.5, on defining reasonable doubt, states that a reasonable doubt is a doubt based upon reason and common sense. This is within the Ninth Circuit's pattern jury instruction. There was nothing belittling about the Court's term. What we had here, as the State court of appeal found, was we had a jury that was apparently attempting to – to interpret the instructions in an arcane or unusual manner. And the context of that – the jury question must be recognized when determining the reasonableness of the Court's response. Counsel, would you please address the abiding conviction argument that was made by opposing counsel? Yes, Your Honor. Thank you. Your Honor, the – this circuit has – has already addressed this. In Leysen v. Henry, this Court has concluded that the – that the 2.90, the California reasonable doubt instruction, without the – the moral certainty language, satisfies due process. But I think opposing counsel's argument was that the abiding conviction should have some kind of proportionality measurement in there to – to give it teeth. What's your response to that? Well, Your Honor, again, I would refer back to my – to my previous statement regarding Leysen v. In that case, this circuit found that even without that language, even without those teeth, as the Court has placed it, that satisfies due process. And so I would submit that this Court is bound by that panel's determination as to that issue. I would further – I would further agree with the comments of Judge Tallman to the effect that regarding the Supreme Court's determination in Victor v. Nebraska that – that this – this issue has been decided in substance. Returning then to – very briefly to the – the point regarding the exclusion of the defense acts in the reconstruction, as I mentioned some of these points earlier when addressing the standard of review, I would like to address a few more points regarding specifically the comments made today. Counsel relies upon – upon Alcala v. Woodford. Again, Alcala v. Woodford addressed this in the context of a due process violation. I would submit perhaps the preferable approach in this instance where we have State court determinations that this was not proffered as to angle of impact is not even a due process analysis, although they – they do tend to approach one another, but it is, in fact, under a Strickland analysis. So for that reason, Alcala v. Woodford is not apposite. But even if this Court were to follow the Alcala approach, that case is distinguishable for a number of reasons. There, the Court specifically pointed out that the State never questioned the experts' qualifications. Well, this, of course, is the heart of the – of the matter before us. We know that the State has questioned the – the experts' qualifications. Furthermore, that Court pointed out that this was not a cumulative issue. Here, this was cumulative. The angle of impact was not the question before the jury. The angle of impact was – was not at issue. The victim conceded he had just made a U-turn or was in the process of making a U-turn. That's at page 88 of the excerpts of record. This was not – this was not at issue. There was another witness, an officer, Officer Connolly, who testified. The victim made a similar statement at the scene. The angle of impact did not matter to determining whether the victim – whether the defendant acted with intent, and that was the issue. Furthermore, even – even if we were to adopt a due process approach as seen in Alcala, the experts' testimony here, for the very same reasons that we've discussed, that it lacked foundation, was not likely to be useful, and therefore, it was not going to change the jury's opinion in the present case. Counsel, I'm intrigued by your position that due process is not – due process analysis is not triggered. Isn't that always available if the appellant is saying that he or she was deprived of a fair trial? Isn't due process always available on appeal? Well, no, Your Honor. If the – if counsel didn't proffer evidence, take for instance – how could we say, for instance, that I was denied due process because the jury never learned of the smoking gun over here, but the smoking gun was never proffered. It was never excluded. But he did it in the context of saying that the denial of the expert testimony violated his right to a fair trial. And you're saying because he didn't proffer the specific testimony on the angle as opposed to the speed, that due process is not available to him as an argument? Yes, Your Honor. That is, in essence, the argument. What we have to look at is – and again, I would ask the Court to look at pages 12 and 13 of the excerpts of record. There, it's unambiguous. And the State court found, and we're bound by the State court determination. The judge is saying, why are you proffering this? The real question here is whether this was an accident. Why are you proffering an accident reconstructionist? And he goes through and he says, well, I'm proffering him. He said, the judge, the court. So all you're going to bring him in for is that. And he's referring – oh, let me back up one paragraph. Top of page 13. We anticipate if Mr. Medina testifies that he will state that prior to the act, to the collision, he put on his brakes in an attempt to avoid the accident. I think that where – that's the record. Mr. Eubanks's testimony becomes relevant is because he corroborates Mr. Medina, what Mr. Medina has to say, which is, I put on the brakes. I got up to 25. I put on the brakes to try and avoid the accident. And I think that is extremely important for the jury to understand. The Court then goes on. So all you're going to bring him in for is that. And then I'll get into this proof in a minute, is the speed of the vehicle at or about the time of impact and whether there's physical evidence to verify that the car was braking or accelerating at the time. Is that basically it? Answer. Basically, yes, Your Honor. He didn't proffer it for the angle of impact. That was not an issue. It was not an issue because we have statements by the victim that he was turning a U-turn. The angle of impact wasn't important. What was important here was why there were no skid marks. What was important here is why is the defendant on the other side of a double-double yellow line? These are the issues that were important here. And whether or not the victim, Mr. Enyan, was turning a U-turn, was going after the defendant, which was undisputed, that was not determinative of what his intent was. So, yes, Your Honor, I would submit we must look to why the evidence was proffered. We can't say that this was a violation of due process because the court excluded something which was never proffered. And the simple fact that the defense attorney got up and provided a summary of the report of the expert, which included the angle of impact to some degree, although, again, I would refer the Court to page 35 of the experts of record where he testifies that, no, I did not know the angle of impact, that we cannot look to that in determining whether there's a due process violation. However, I believe, as I said at the forefront, that the two analyses come close to each other, because under either approach, and this is what the district court judge ruled, under either approach, it doesn't matter. There's no due process violation because he was incompetent, unqualified to testify as a matter of State law. And thus, whether we look at it under the structure of due process or ineffective assistance of counsel, it really doesn't matter. If he was incompetent, it was then — excuse me, if the expert was incompetent, then it could not have fallen below objective professional norms. If he was incompetent, then certainly there was no violation of due process. Thank you. Thank you, counsel. Thank you. With respect to the EDPA standard, I think the quote in my reply brief from Baines is pretty specific, saying whatever the standard used by the State, we're going to use Brett. I think that answers the question. And I also read the cases that were cited in the supplemental 28J letter as essentially endorsing the Breck standard for review of constitutional error myself. With respect to the proffer, what counsel said is correct in reading the record, I would say also add that five pages later, the defense says, That's at page 16 of the ER. And then on pages of the appellant's ER, starting at 115 is the report specifically talking about angle and speed. Now, Mr. Indians, this testimony would have been impeached in it because he was very equivocal about his admission about making a U-turn. He said he had parked his pedicab going in. I believe this is the east direction on Marcus Street. Well, how is it? How would have been possible for the car to hit the right rear wheel of that without him making a full U-turn? As Medina testified, he did just before the accident occurred. And with respect to the issue of the jury instruction, the district court finding found that people could have taken umbrage at being told by the court that this was not rocket science. And if one looks at what the court said about two pages earlier to the attorneys in the transcript about what he felt about the jury question, again, this was outside the presence of the jury. But he said it was evidence of the dumbing down of America and the jurors were in somebody and the jury was in Never Never Land. Let me ask you this, though. Would that necessarily be a negative for the defendant? Would it equally apply to the government and the defendant? How do we know if they were offended or took umbrage that that would necessarily inure to the detriment of the defendants? Well, they would be upset. So their questions were the questions they were asking concerned intent and the burden of proof beyond a reasonable doubt. They could have been upset against the prosecution as well as against the defendant. So it could be a watch. We don't know that that was prejudicial to the defendant. Thank you. Thank you very much. Thank you, counsel. The case just argued and submitted, and we will be adjourned until 9 o'clock tomorrow morning.
judges: Noonan, Tallman, Rawlinson